STEPHEN TONCHEN, Plaintiff-Appellee, v. ALL-STEEL EQUIPMENT, INC., Defendant-Appellant.

(No. 71-324;

Second District—August 6, 1973.

*Rehearing denied September 11, 1973.*

Alfred Y. Kirkland, of Elgin, and Robert L. Stern, of Mayer, Brown & Platt, of Chicago, for appellant.

William J. Voelker, Jr., of Heyl, Royster, Voelker & Allen, of Peoria, and R. Sheridan Welch, of Kewanee, for appellee.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

The plaintiff filed a seven count complaint for fraud and deceit based on the alleged failure of the defendant, All-Steel Equipment, Inc., an Illinois Corporation (hereinafter referred to as All-Steel) to comply with promises made to plaintiff, which induced him to release his claims against a corporation entitled B. M. Fittings Corporation (hereinafter referred to as BMFC), when All-Steel was in the process of acquiring the assets of BMFC. Trial was had on the first four counts only; counts V, VI, and VII which sought specific performance of the alleged promises were not passed upon by the court or jury. The jury returned a verdict on all four counts totalling $2,340,000; $340,000 being for compensatory damages and $2,000,000 for punitive damages. Judgment was entered on the verdict and defendant appeals. The issues presented to this court are whether the defendant is entitled to a judgment notwithstanding the verdict, to a new trial, to a remittitur of all the punitive damages and a portion of the compensatory damages.

The plaintiff, Stephen Tonchen, had been engaged in various phases of design and manufacture of electrical fittings for a period of over thirty years. In 1957, at the request of the B. M. Fittings Corporation, a company owned by the Briegel family, Tonchen went to Galva, Illinois, and was employed for the purpose of introducing a method of producing fitting components which he developed into the operation of BMFC. BMFC was a manufacturing concern located in Galva, specializing in a type of electrical indenter fitting. Tonchen proceeded to replace BMFC

equipment with multi-slide machinery, and his own tooling and machine parts of the value of $150,000 which he had brought from the east, where he had been engaged in business. Two years later, a dispute arose between Tonchen and the Briegels, the owners of BMFC. Tonchen filed a lawsuit and judgment was entered in Tonchen's favor in the amount of $204,485.56. BMFC was unable to pay the judgment and an agreement was entered into on May 16, 1964 as to payment in part, substantially as follows:

(1) $104,485.56 of BMFC's inventory was to be sold and Tonchen was to act as intermediary to collect the proceeds of the sale as partial payment.

(2) BMFC was to pay Tonchen $100,000 in annual installments equal to 20% and not more than 75% of net profits of BMFC before taxes. This payment was to be not less than $20,000 a year.

(3) Tonchen was to remain as general manager until the $100,000 evidenced by a note in that amount was paid, or for five years if the note was not paid off in that time. His salary was to be $15,000 a year plus 25% of BMFC's net profit before taxes.

(4) It was further provided that the contract entered into was not an exclusive contract and Tonchen could work for himself or others.

The agreement recognized ownership of his trade secrets, specifications, designs and processes for production being used by BMFC. Upon the termination of this management contract the title to machines, parts, and tooling parts, acquired or introduced into the operation of BMFC by Tonchen was to vest in BMFC, subject to the condition that

"none of such machines, machine parts, tooling or tooling parts shall be sold by the Company or otherwise disposed of so that the same enter into competition with Tonchen or any company or party that he may be connected with, otherwise said machines, machine parts, tooling or tooling parts shall become the property of Tonchen."

Tonchen proceeded to sell part of the inventory and collected $100,000. He then invested $22,000 of that back into the business of BMFC under the agreement of May 16th, 1964, above. Tonchen had also established and conducted his own business in Galva, Illinois, entitled the Royal Engineering & Manufacturing Company with some seven employees, which was concerned with the development of liquid tight fittings.

In May, 1964, All-Steel became interested in the BMFC plant in Galva and the liquid tight fittings. It happened that by blending the

component parts of BMFC's and Tonchen's fittings, a saleable item could be produced.

In August, 1964, Tonchen went to Hawaii to visit his son who was ill. When he returned, BMFC locked him out of their plant on or about August 11, 1964.

About August 25, 1964, All-Steel through its various officers began negotiating with BMFC for the purpose of acquiring their plant. These negotiations continued on into the autumn.

On October 27, 1964, Tonchen filed a second suit against the Briegels and BMFC for the breach of the May 16, 1964 agreement. In that four count suit Tonchen prayed for the following:

(1) The sum of $71,875 salary due to him under the May, 1964, agreement.

(2) $100,000 as Tonchen's 25% share of BMFC's profits for five years.

(3) Restitution of trade secrets, specifications, tools and processes valued at $150,000.

(4) $96,533.02 balance due on the note given under the May 16, 1964 agreement.

In January, 1965, All-Steel came to the conclusion they would not purchase BMFC's assets without a release of Tonchen's claim or rights. Negotiations were continued however with Tonchen by All-Steel through a Mr. Weber (an employee of All-Steel) during the month of January, 1965. After conversations between Tonchen and Weber, on January 26, 1965, Weber set up a meeting with certain officers of All-Steel, Tonchen, and their respective attorneys for February 2, 1965, at All-Steel's headquarters in Aurora. The purpose of this meeting dealt with arrangements for All-Steel to purchase BMFC and to determine from Tonchen what would be necessary to release his claims.

On February 2, 1965, the All-Steel officials met with Tonchen and attorneys for both Tonchen and All-Steel were present. Tonchen was advised to keep in touch with Mr. Weber and a Mr. Rudolph, who was also from All-Steel. Several meetings were had between Tonchen, Weber and Rudolph, relative to the reducing of the February 2, 1965, agreement to writing. It is alleged that because of the animosity between the Briegels and Tonchen, All-Steel did not want to reduce the agreement to writing. Tonchen, on the other hand, sought to have it put in writing but this was never accomplished.

On May 14, 1965, Tonchen settled the second lawsuit described above, with BMFC for the sum of $122,000 and gave a complete release of any claim he had against the Briegels and BMFC under the May, 1964, agreement.

Ten days later, on May 24, 1965, Tonchen signed a letter to All-Steel in which he did not refer to any employment contract, liquid tight fittings, or other matters for which he is claiming compensation in the suit before this court. The letter signed by him is as follows:

"It is my understanding that you are now proposing to purchase the business and assets of B. M. Fitting Corporation, and that out of the proceeds of such purchase, settlement of my various claims against that corporation and affiliated parties will be effected by the payment of $122,000, in which I will participate.

This will confirm my understanding (and as an inducement to you to so purchase the assets of B. M. Fitting Corporation, I hereby covenant) that the various releases given by the undersigned to B. M. Fitting Corporation, with respect to the claims of the undersigned, are intended to include All-Steel Equipment, Inc. and its subsidiaries as beneficiary thereof by virtue of succession to the business of B. M. Fitting Corporation. Further, I warrant that said All-Steel Equipment Inc. or its subsidiaries may continue the production of the present products sold by B. M. Fitting Corporation without obligation for royalty, license fees, or other claim of the undersigned as a result of such operations."

The obvious purpose of this document was to induce All-Steel to purchase the assets of BMFC. It is contended that because of the bad feeling between Tonchen and the Briegels no mention was made of any possible connection between Tonchen and All-Steel in the future.

On June 2, 1965, the BMFC properties were purchased by and transferred to All-Steel. In July, 1965, All-Steel stopped all negotiations with Tonchen. The instant suit was filed by Tonchen against All-Steel in November of 1970.

In Count I Tonchen set up the February 2, 1965 oral agreement with All-Steel claiming a salary of $15,000 a year, for one-third of his time, alleging a total amount due of $140,000, no number of years being specified.

In Count II Tonchen alleged that he relied upon the representation of All-Steel and he was induced and agreed to permit All-Steel to market his fittings either on a royalty basis with the fittings manufactured by the defendant, or on a discount basis, the fittings to be manufactured by Tonchen. He alleged that he terminated negotiations with other manufacturers as a consequence of All-Steel's representations. He further alleged that as a result of the fraudulent representations of the defendants he was damaged in the sum of $100,000 and because of the malice and fraud involved, he was entitled to punitive damages of $1,000,000.

In Count III Tonchen alleged that in the meeting with All-Steel on

February 2, 1965, Tonchen advised All-Steel that there were orders of BMFC procured by Tonchen in the process of being honored and filled; that Tonchen believed that All-Steel would honor the delivery of these orders, and as a result thereof he released his claim against BMFC, and by so doing he enabled All-Steel to acquire the BMFC business. He further alleged that All-Steel's representations that they were making such deliveries was the only reason that he released his claims against BMFC. In this count Tonchen contends that the representation as to the delivery of these orders was false and untrue, that he was damaged because of the alleged fraudulent and malicious representations in the sum of $50,000, and further, because of the fraud and malice he was entitled to $1,000,000 punitive damages.

In Count IV Tonchen alleged that at the February 2, 1965, meeting the defendant All-Steel agreed that they would make available to him at the All-Steel plant, facilities and certain production parts of BMFC for his use in his personal development work to the same extent that they had been made available to him under his contract with BMFC. This was the only factor which caused him to release his claim July 2, 1965, against BMFC for damages for their failure to provide such facilities. He further alleged that these representations were made by All-Steel to induce him to release his claims against BMFC, that they were false and fraudulent, and that he is entitled to $50,000 in compensatory damages and $1,000,000 in punitive damages.

The entire suit before us is based upon the purported oral agreement of February 2, 1965 between Tonchen and All-Steel. This meeting took place at the All-Steel office. Messrs. Frank Mc Quown, Maynard H. Snyder, and Wesley A. Weber, were present representing All-Steel. It is to be expressly noted that at this meeting both All-Steel and Tonchen were represented by counsel, Mr. Koerber representing All-Steel and Mr. William J. Voelker, Jr., representing Tonchen.

■■ We turn first to Count II of the complaint. In this count the plaintiff alleged that at the February 2, 1965 meeting, All-Steel agreed that they would merchandise Tonchen's liquid tight fittings on a priority basis for a period of one year. Plaintiff alleges that he did not negotiate with anyone else because of this and that All-Steel refused to market the liquid tight fittings, thus resulting in actual compensatory damages to him in the sum of $100,000 and this is the verdict the jury brought in. To substantiate this part of Tonchen's complaint, he alone testified as to the possible profit he could have made from the marketing of his fittings. While the testimony is confusing it would appear that in substance Tonchen testified:

"A. The fittings that I planned to market under this price list

were the fittings that I had made a prototype or sample of, when I was at B. M. Fittings Corporation's plant."

He further testified that he was going to place certain fittings on the market for the first year; that he had computed the cost and the sales he reasonably expected to make based upon his knowledge and experience; and that it would be a little over three-quarters of a million dollars which figure represented what the "basket electrician" would pay ("basket electrician" being one who buys the item and places it in his basket for use on the job). He further stated that his sales price would be one-half of the three-quarters million dollar figure and that on that figure his profit would be either 5% to 10%, or 5% to 15%. It can thus be seen that by Tonchen's own testimony his profit, if he in fact did produce the items and were able to sell them, would range from $18,650 to $56,250. It is difficult to see on the basis of this, it being the only testimony as to the loss suffered due to All-Steel's alleged failure to market his product, how the jury could award $100,000 in actual damages.

As counsel has pointed out:

> "An estimate of profits by an interested witness does not constitute such evidence as will support a judgment for damages." *Podlaski v. Bender*, 150 Ill.App. 312, headnote.

■■ In addition to this, in this court's opinion the loss of profits from the alleged failure, if any, of All-Steel to market Tonchen's product is speculative. (See *Rapp v. Hiemenz* (1969), 107 Ill.App.2d 382, 246 N.E.2d 77.) Likewise, in *Consumers' Pure Ice Co. v. Jenkins* (1895), 58 Ill.App. 519, 524-525, the court held:

> "* * * A thousand things might have prevented the realization of the profits sanguine witnesses estimate could have seen. Customers may fail to pay; rivalry may cause a decline in price; accidents may suspend business; injuries to employees or strangers may cause loss; dishonesty may sweep away funds."

In substance, as counsel has pointed out, the Illinois courts have repeatedly held that:

> "Profits cannot be recovered as an element of damages where they are speculative, contingent or uncertain." *Saladan v. East St. Louis & Interurban Water Co.* (1936), 284 Ill.App. 358, 361, 1 N.E.2d 731, 733.

See also *Weiland Tool & Mfg. Co. v. Whitney* (1969), 44 Ill.2d 105, 117, 251 N.E.2d 242, 248-249.

■■ To emphasize the speculative nature of plaintiff's claim in this Count it is to be noted that Plaintiff testified that from July, 1965, when Tonchen and All-Steel came to a parting of the ways, to the date of the

trial, a period of approximately five years, Tonchen never sold any of his liquid tight fittings to the industry.

■■ With respect to Count III Tonchen contends that he advised All-Steel that there were unfilled orders with BMFC which All-Steel would fill and that for that reason he released his claim against BMFC. In this regard the record discloses that Tonchen testified that he advised Mr. Mc Quown of All-Steel on February 2, 1965, that there were orders that "BMFC was committed to because they had the cash laid down in the bank" and that Mc Quown stated there was no problem and the orders would be filled. In his testimony he then referred to four companies whose names he gave to Mc Quown. The record discloses no other evidence with regard to these unfilled orders. Tonchen could not make any personal profit on these orders nor was he personally liable for BMFC's failure to complete them, nor was he liable for All-Steel's failure to complete these orders, if there were any. The only damage that the plaintiff could suffer from the failure of All-Steel to fill these orders would be, as he alleged, damage to his reputation and the trial judge in fact charged the jury that the plaintiff could recover on this count "for the damage to his reputation proved by the evidence to have resulted from defendant's wrongful conduct in failing to fill the orders of B. M. Fittings Corporation." As counsel for the defendant points out, there is no evidence in the record whatsoever that the alleged failure of All-Steel to fill these orders damaged plaintiff's reputation. No evidence in this regard was adduced in any fashion except by counsel's statement in his closing argument that plaintiff's reputation was so damaged. The trial court in the absence of any proof of damage to his reputation should have directed a verdict for the defendant as to Count III of the complaint.

■■ Turning to Count IV of the complaint, the plaintiff alleged that at the same February 2, 1965 meeting the defendant advised the plaintiff there would be available to him at the All-Steel plant, tool and die making facilities, machine shop facilities, and production parts of BMFC for his use in his personal development work, the same as they were under the BMFC contract at Galva, and as a result of this he executed his release against BMFC and that the damages he sustained thereby were $50,000. The only testimony in this regard found in the record is that of the plaintiff himself where it appears that he figured that the value of these facilities "would be something in the neighborhood of approximately, in round figures, of $900 I would say per month." He testified further that this was an engineering estimate on the particular work he was doing on the liquid tight fittings and he arrived at this figure as an estimate of what it would cost him to do this work at the

B. M. Fittings plant with the set-up he had there. No other evidence was offered as to the length of time or as to the cost of comparable facilities. The somewhat incongruous situation in this regard is that while the record is confusing, Tonchen had testified that by the summer of 1965 he had for all practical purposes completed the work on the fittings. Once again, it is difficult to determine from the record how Tonchen arrived at the figure of $50,000 in actual damages, and again, even more difficult to ascertain upon what basis the jury, on the evidence adduced, gave an award for that amount. At $900 a month this would provide Tonchen with facilities for a period of four years and seven months, yet there is no evidence whatsoever as to time deemed necessary even by the self-serving testimony of Tonchen himself. The verdict of the jury in this regard is against the manifest weight of the evidence.

■■■ We next come to the defendant's contention that under Illinois law the failure to perform a promise to do some act in the future does not constitute fraud. In support of this contention counsel directs our attention to the oft cited case of *Brodsky v. Frank* (1930), 342 Ill. 110 at 117-118; 173 N.E. 775 at 778:

> "* * * A false representation within the meaning of the law, in order to constitute a cause of action, must be a representation as to an existing or past fact and not a mere promise to do some act in the future. A failure to comply with a future promise does not constitute fraud. The general rule is that to amount to fraud there must be a wilful, false representation as to an existing or past fact."

Following *Brodsky* the Supreme Court of Illinois in *Sinclair v. Sullivan Chevrolet Co.* (1964), 31 Ill.2d 507, 510, 202 N.E.2d 516, 518, said:

> "* * * To be actionable, a false representation must generally relate to an existing or past event, not to a promise or prognostication concerning a future happening."

In *Metropolitan Sanitary District of Greater Chicago v. Pontarelli* (1972), 7 Ill.App.3d 829, 288 N.E.2d 905, 913, the alleged fraud was that at the time of the contract defendant represented it would do the work required, and while in fact defendant knew these representations were false and never intended to abide by the terms of the contract, plaintiff admitted that under Illinois law, which apparently at the present time is the minority rule, action for fraud may not be predicated upon promises to perform in the future. Plaintiff there urged the court to change the law in this regard which the court refused to do stating at pages 841-842:

> "* * * In its brief plaintiff admits that no cause of action exists in Illinois based upon these grounds. Plaintiff goes on to urge that

this court change the law in his regard, as other jurisdictions have done. We do not perceive that to be the function of this court, and we therefore decline to do so, following instead the existing law of this State as reiterated in *Illinois Rockford Corp. v. Kulp* (1967), 88 Ill.App.2d 458, 472-473, 232 N.E.2d 190, 198, *rev'd. on other grounds*, 41 Ill.2d 215, 242 N.E.2d 228, where the court stated:

'A misrepresentation relating to something to be done in the future does not constitute such fraud in law as will give rise to the recovery of damages in an action for fraudulent misrepresentation. The fraud must be complete at the time of the transaction and consequently cannot be based upon an intention to commit a fraud in the future. May v. (Chas. O.) Larson Co., 304 Ill.App. 137, 26 N.E.2d 139. A fraudulent misrepresentation which induces a person to action must be based upon a present or a past fact and cannot rest upon a false promise to do something in the future even though accompanied by an intention not to perform. Stewart-Warner Corp. v. Remco, Inc., (7 Cir.,) 205 F. ed 583.'

*Accord, Brodsky v. Frank* (1930), 342 Ill. 110 117, 173 N.E. 775, 778."

In the instant case the plaintiff contends that *Illinois Rockford Corp. v. Kulp* cited above substantiates his position and states that that case involved conduct on the part of the defendant which went far beyond the mere making of promises to be fulfilled in the future. In *Kulp* the supreme court reversed the appellate court's finding on the ground that there was a fiduciary relationship between the parties, that the defendant violated his fiduciary duty, but did not reverse the rule that a misrepresentation as to something to be done in the future constitutes fraud that will give rise to recovery of damages. See *Federal Deposit Insurance Corp. v. Wainer* (1955), 4 Ill.App.2d 233 at 237; *May v. Larson* (1940), 304 Ill.App. 137, 26 N.E.2d 139, 143.

■■ We come then to the question of punitive damages. The plaintiff asked for a total of $3,000,000 in punitive damages in Counts II, III and IV of his complaint. The jury awarded him $2,000,000 in punitive damages. We have found above that the evidence adduced in this case does not substantiate compensatory damages of $100,000 returned by the jury in Count II as being purely speculative.

As to Count III we have found plaintiff failed to prove in any manner any damage to his reputation and that the trial court should have directed a verdict for the defendant as to Count III.

As to Count IV we have found that the verdict of $50,000 "being the

amount asked by the plaintiff; for the use of BMFC facilities" was against the manifest weight of the evidence.

It can thus be seen that the jury on these three counts awarded the exact amount asked for compensatory damages but only awarded $2,000,000 instead of the $3,000,000 asked for punitive damages. While it is not necessary so to do, we are unable to determine upon which of the above three counts the punitive damages were allowed.

The courts of Illinois have repeatedly stated that punitive or exemplary damages are not a favorite of the law. *City of Chicago v. Shayne* (1964), 46 Ill.App.2d 33, 196 N.E.2d 521; *Wetmore v. Ladies of Loretto* (1966), 73 Ill.App.2d 454, 220 N.E.2d 491.

■■■ The basic rule in Illinois is that punitive or exemplary damages may not be awarded in the absence of actual damages. As early as 1873 in *Freese v. Tripp*, 70 Ill. 496, the court held that exemplary damages could not be awarded in the absence of finding of actual damage. This rule has been followed consistently in Illinois down to the last case reported on this question, *Shrout v. McDonald's System, Inc.* (1968), 90 Ill.App.2d 60, 234 N.E.2d 45, where the court held that where actual damages are not recoverable, there can be no award of punitive damages. Having found herein that the compensatory damages must be set aside for the reasons indicated above, it therefore follows that the punitive damages must be disallowed.

■■ We now return to the contention of the plaintiff, Tonchen, in Count I of the complaint wherein he claimed $140,000 for salary. Tonchen contended that he was employed by BMFC on May 1, 1964 for a period of five years at the rate of $15,000 a year. On August 13, 1964 his employment was terminated by BMFC, and on October 28, 1964 Tonchen then filed a suit alleging the employment contract for five years at $15,000 per year. The claim for the purported lost salary was satisfied in full by the release given BMFC on May 24, 1965. The claim for salary in this suit is based upon the following remarks testified to only by plaintiff Tonchen as to the purported oral agreement entered into on February 2, 1965:

> "Well, there was something said concerning employment but we did not talk about it per se. What I mean by that, we talked about it."

In response to an inquiry by his counsel as to whether Mr. Mc Quown said anything to Tonchen about the employment contract on February 2, 1965, Tonchen replied:

> "A. He said 'that as far as the employment was concerned,' he said 'that they do not have at the All-Steel or Raco plant a man who had abilities like mine. And as a part of the package arrangement

that we were making I could come in there and have employment with them.' And he made reference to the contract I have with Briegels.

He said 'you were paid $15,000 before there and you can have the same thing here on a one-third time basis.

Q. Were there any further details discussed—What if any further details were discussed at that time with reference to how much you were—of your time you were to spend with All-Steel?

A. There was a discussion about my age and there was a discussion about the time I would work, would be a time I would select."

\* \* \*

"Q. What if anything was said as to how long the arrangement was to continue?

A. There was something said about how long the arrangement was to continue, but the thing was pretty much left—this was up to me to select the time.

Q. What if anything was said as to what part of your time was to be the one-third? What part of your one-third time was to be spent at All-Steel?

A. It was not particularized. It was left up to me. And it was discussed at that time my boy was in Hawaii and I could select the certain time I could go visit him.

Q. What if anything was said as to how long a period of time it was continuing—that it was to continue?"

At this point there was an objection and counsel for plaintiff stated "it was to continue as long as he wanted it to continue." Based upon this conversation plaintiff claimed $140,000 for salary at the rate of $15,000 a year, and the jury returned a verdict for that amount which would represent loss of earnings for nine and one-third years. It is difficult to perceive how plaintiff arrived at that amount and even more difficult to determine how the jury reached that figure from the evidence presented. Mc Quown, on the other hand, testified:

"If any figures involving salary were mentioned that they were purely examples to give future consideration to at a subsequent date, if and when an employment arrangement was discussed with Mr. Tonchen."

There is distinct confusion as to whether Count I was, or is, based upon fraud or breach of contract. Examination of Count I in the amended complaint discloses no allegation of fraud, and this count sets out strictly an allegation of breach of contract of employment. No motion was made to conform the pleadings to the proof. At the conference on instructions,

counsel for both plaintiff and defendant variously considered this count as based upon fraud, or based on breach of contract. As a natural result of this, the trial court was confused as to which theory was being presented. Defendant contends in its brief that, "Actually Tonchen is now trying, on Count I, to shift back to the contract theory which he originally pleaded. But Count I was submitted to the jury as a fraud count with Tonchen's consent." Plaintiff asserts in his brief, "Although Counts II-IV were predicated on the theory of fraud, Count I was for breach of contract."

Further confusion is disclosed in the instructions given to the jury. Plaintiff's instruction No. 7 was applicable to all four counts of the complaint and sets out "the false and fraudulent representations made by the defendants * * * that the foregoing was the proximate cause of injury and damage to him * * *."

Nothing would be gained by detailing further the confusion in this regard.

We thus arrive at the question in the case before us as to whether or not the parties have in fact joined issues upon facts or theories not alleged in the amended complaint.

■■ It is an elementary rule of law that the issues in a case are formed by the pleadings and the allegations and the proof must correspond. A party may not prevail where the proof does not follow the allegations, and conversely where the allegations are not substantiated by any proof. As the court stated in *Burke v. Burke* (1957), 12 Ill.2d 483 at 487, 147 N.E.2d 373 at 376:

> "* * * A party to a suit, either at law or in equity, cannot have relief under proofs without allegations, nor allegations without proof in support. *Central States Coop., Inc. v. Watson Bros. Trans. Co.*, 404 Ill. 566; *Leitch v. Sanitary District*, 386 Ill. 433, 54 N.E.2d 458."

See also, *Gault v. Sideman* (1963), 42 Ill.App.2d 96, 191 N.E.2d 436.

■ There is an exception to this rule and that is where both parties form the issues in the trial, notwithstanding the failure to set the issue out in the pleadings. This was well stated in *Hemingway v. Skinner Engineering Co.* (1969), 117 Ill.App.2d 452, 463, 254 N.E.2d 133, 138, where we stated:

> "Thus, in this case, the parties, irrespective of the pleadings, formed their own issues during trial, and an objection that an issue was not raised in the pleadings, may be waived by the conduct at the trial of the objecting party, or by such party introducing evidence on the issue. *Hedrich v. Village of Niles*, 112 Ill.App.2d 250 N.E.2d 791 (1969)."

In *McKinney v. Nathan*, 1 Ill.App.2d 536, 117 N.E.2d 886 (1954), at page 543, the court stated:

'The parties may, by the introduction of evidence or their conduct in the trial, waive formal pleadings or form their own issues on the evidence introduced, and they may voluntarily present under the evidence issues not presented by the pleadings. An objection that a certain matter is not an issue under the pleadings or that it is not denied or properly denied may be waived by a party where he introduces or brings out evidence bearing on the subject, or tries the case as if the matter were not in issue.'

By the testimony offered by the parties and by their conduct at the trial, all deficiencies with reference to any variations between the allegations and the proof were waived."

■■ In brief summation, Count I of the complaint sets out a breach of contract for employment. The record discloses various and sundry allegations of fraud as a basis for recovery under Count I. Counsel at various times treat this count as a breach of contract and at other times as fraud. If the jury were not confused as to the elements of proof as to Count I, it would be most unusual; the trial court was, counsel were; and it must be admitted that this court cannot determine whether the jury based its verdict as to Count I upon breach of an employment contract or upon fraud. If Count I is based upon fraud alone, this constitutes a promise to do something in the future which, as enunciated above, would not constitute a valid claim for damages.

The cause is reversed and remanded as to Count I and a new trial is granted as to this count only. The issues raised under this count will not be discussed herein as it is hoped they will not arise in a new trial.

Reversed as to Counts II, III and IV.

Reversed and remanded as to Count I.

SEIDENFELD and ABRAHAMSON, JJ., concur.