Dewey CATES and Barbara Cates, partners d/b/a U. S. 40 Motel, Plaintiffs-Appellants, Cross-Appellees,

v.

MORGAN PORTABLE BUILDING CORPORATION, Defendant-Appellee, Cross-Appellant.

Nos. 76–1627, 76–1703.

United States Court of Appeals, Seventh Circuit.

Submitted Oct. 30, 1978.

Decided Jan. 10, 1979.

As Amended Jan. 12, 1979.

Francis L. Ruppert, Clayton, Mo., for plaintiffs-appellants.

Andrew F. Greensfelder, St. Louis, Mo., for defendant-appellee.

Before CASTLE, BAUER and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This action for breach of contract alleging $55,975.95 in consequential damages was filed in federal district court on August 2, 1971, on the basis of diversity of citizenship. On September 13, 1974, after several settlement conferences with the district court, the parties stipulated that all matters except the determination of consequential damages would be submitted to binding arbitration. Thus the district court's order was limited to consequential damages and it is only from the decision awarding the plaintiff $4,671.00 that both parties appeal. We reverse and remand.

## I. BACKGROUND.

Plaintiffs Dewey and Barbara Cates are the owners and operators of the U. S. 40 Motel and an adjacent trailer court in St. Clair County, Illinois. On June 29, 1970, the Cates entered into a written contract with defendant Morgan Portable Building Corporation, a Texas corporation, for the purchase of two modular housing units, each to contain five motel rooms so that the motel's room capacity could expand from 12 rooms to 22 rooms. Under the agreement, Morgan was obligated to deliver the units by July 31, 1970, and then install them for a purchase price of $25,947.76. Morgan, however, did not deliver and begin installation until September 1970. Plaintiffs immediately complained that the units did not conform with the contract specifications and about a year later they sued for breach of contract.

After the trial had begun the parties stipulated, *inter alia,* that all matters except consequential damages would be submitted to binding arbitration, but if the parties were not in agreement regarding the amount of consequential damages by the time the arbitrator was to have decided other matters, that issue would be determined by the trial court.

Because the parties were unable to resolve the consequential damages question, the district court held an evidentiary hearing on May 8, 1975, only on that issue. Plaintiffs introduced evidence of lost profits allegedly caused by the defendant's delay in installing the motel units. The evidence included (1) the occupancy rates for the existing 12 motel rooms for the years 1970 through 1975,[1] (2) the net profit margin for the existing rooms determined by subtracting the motel's expenses from its gross income, (3) a letter from an officer of the Brada Miller Freight System, Inc., stating that that trucking company would rent at least 135 rooms in the motel each month if the new additions were completed, (4) statements that since 1971 three new large motels were constructed in the plaintiffs' market area, and (5) evidence that two small motels with similar prices and accommodations located one and a half to four miles from the U. S. 40 Motel had each added thirteen rooms between 1973 and 1975.

On the basis of that evidence plaintiffs argued that it was reasonable to expect that their new addition would have had an occupancy rate similar to that of their existing motel rooms. Therefore, they asserted that the proper measure of their lost profits was the additional number of rooms which allegedly would have been rented each year[2] multiplied by the net profit per room rented for each year. According to plaintiffs' calculations, lost profits totalled $55,975.95 from September 1, 1970, through April 30, 1975.

---

1. The average occupancy rates were: 1970, 43 per cent; 1971, 65 per cent; 1972, 53.4 per cent; 1973, 70 per cent; 1974, 67 per cent; and 1975, 55 per cent. The 1970 percentages only included the last four months of that year and the 1975 percentages only included the first four months of operation in that year. Defendant has questioned the accuracy of these figures.

2. That figure would be determined by the following formula: 10 rooms times the number of days units should have been available for use times the percentage of occupancy for that year.

## II. THE DISTRICT COURT'S CALCULATION OF CONSEQUENTIAL DAMAGES.

In its decision the district court correctly assumed Illinois law applied to this diversity action and found that the transaction was governed by Article 2 of the Uniform Commercial Code stating:

> The Code became effective in Illinois on July 1, 1962. Plaintiffs filed suit in 1971 on a contract signed in 1970. § 2–102 of the Code (Ch. 26, Ill.Rev.Statutes) states in part, "Unless the context otherwise requires, this Article applies to transactions in goods . . ." This Court concludes that the two prefabricated modular units (each consisting of five motel units) which defendant agreed to provide plaintiff, are "goods"[3] under the Code.

The court also noted the Code section on consequential damages which reads:

> Consequential damages resulting from the sellers breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise.

U.C.C. § 2–715(2)(a). The trial court specifically cited the comment 4 to Section 2–715 which provides:

> The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances.

Ill.Rev.Stat. ch. 26, § 2–715.

Commenting on the absence of cases since the adoption of the Code, the trial judge concluded that the plaintiffs' measure of consequential damages was unreasonable.[4] The trial judge emphasized he would rely mostly upon the Code and comments, and consider the specific business alleged to have been lost by the plaintiff. The trial judge awarded the plaintiffs $4,671.00 primarily on the evidence of one letter,[5] written after the filing of this suit, saying:

> Edgar LaCour, formerly vice-president of Brada Miller Freight Systems, Inc., an interstate freight hauler, stated in his deposition of June 9, 1975 that the truck company which he worked for had their headquarters at the Gateway Truck Stop, located two or three miles from the plaintiffs U. S. 40 Motel. In a letter dated February 21, 1972 . . . Mr. LaCour indicated to the plaintiffs that his company, in terms of possible new room usage, "would average at least 135 rooms per month and will use your motel the moment it is available."

To determine damages for the years 1973, 1974, and part of 1975, the court multiplied the number 135 by its own calculation of net profit per rented motel room, which it based on the combined federal tax returns for not only the motel, but also the trailer park operation. The court allowed no lost profits for 1971 or 1972 because it determined, again on the basis of the combined federal tax returns, that the motel suffered a net loss during those years.

---

**3.** The trial court noted that modular motel units come within Article 2. " 'Goods' means all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale . . .." U.C.C. § 2–105.

**4.** The district judge further concluded that Morgan knew the intended use of the modular motel units. He also rejected defendant's defense of substantial completion as having been refuted by the arbitrator's award of other damages to the plaintiffs.

**5.** The letter reads in part:
Gentlemen:
   Would like to say that we are very much in need of motel rooms for our drivers somewhere in this area. As stated, your place would lend itself very well to our needs if you had the space available. The units now not in use would serve us well. . . .
   We feel that we would average at least 135 rooms per month and will use your motel the moment it is available.
   It is possible for us to effect a large savings and have a great deal more convenience if your establishment were available to us.

III. THE DISTRICT COURT'S MEASURE OF CONSEQUENTIAL DAMAGES WAS CLEARLY ERRONEOUS.

The judge relied on figures from the Cates' federal tax returns which included the profits and losses for both the motel and trailer park. We believe that only the profits or losses of the motel should have been considered. Further, more accurate information was available from Cates' estimates of the allocation of expenses between the trailer park and the motel, and from the information reports[6] which revealed the gross income from the motel business alone. Those figures show that the motel business did turn a profit in both 1971 and 1972. Thus lost profits should have been allowed for those years. The district court also arrived at a lower net profit figure per room rented by using the combined figures than would be obtained by using only motel information. We conclude there is a clear error in the district court's findings of fact.

In addition, we regard the trial court's reliance on the figure 135, the estimate of monthly room occupancy given by one potential customer, as misplaced. The Code does not require that consequential damages be proven with mathematical precision. "Loss may be determined in any manner which is reasonable under the circumstances." Official comment 4 to UCC Section 2–715, Ill.Rev.Stat. ch. 26, § 2–715 —S.H.A. p. 588. The district court's projection of increased occupancy of 135 rooms per month based on the letter appears to require unwarranted certainty as to specific losses without regard to other less specific factors.

We understand the trial court's difficulty in determining the proper measure of damages. Guidance in the case law is not easy to find. In *Hardesty v. Andro Corp.-Webster Div.*, 555 P.2d 1030, 20 UCC Rep. 352 (Okl.1976), the owner of a number of apartment buildings contracted for the installation of an air-conditioning system for a new apartment complex. The air-conditioning did not function for over a year and the owner sued the air-conditioning installers for lost profits. At trial the plaintiff showed that occupancy rates in the new building were lower than in the plaintiff's other apartment complexes with air-conditioning. The Oklahoma Supreme Court upheld a jury determination that the plaintiff could base his lost profits on the difference in revenues between the 95 per cent occupancy rate of the owner's other buildings and the 83 per cent occupancy rate of the new apartment. In the case at bar, the district court should give greater weight to the occupancy rates of the motel owned and operated by the Cates.[7]

---

6. Under Section 6 of the Illinois Hotel Operators' Occupation Tax Act, each Illinois motel owner is required to file with the state an annual information report indicating the gross income on which the "hotel-motel tax" is reported. These forms provide the Cates' gross income from the combined businesses and breakdown the income between the motel and the trailer park.

7. In the present case the owners of an on-going motel business were seeking to expand the operating capacity of the same business. In the cases where on-going businesses were completely halted the courts have almost universally used net profits from previous years to determine the amount of consequential damages. Comment, *Remedies—Lost Profit as Contract Damages for an Unestablished Business: The New Business Rule Becomes Outdated,* 56 N.C. L.Rev. 693 (1978). This approach is based on the theory that a business' profits in past years, when the business was under the same management and located in the same area, is the best possible measure of the business' (now lost) profits in future years.

In contrast, in cases involving the establishment of new businesses plaintiffs have often been denied recovery of any lost profits because of the failure of proof. *See Tonchen v. All-Steel Equipment, Inc.,* 13 Ill.App.3d 454, 300 N.E.2d 616 (1973). For example in *Gerwin v. Southeastern California Association of Seventh Day Adventists,* 14 Cal.App.3d 209, 92 Cal.Rptr. 111, 8 UCC Rep. 643 (1973), "[b]ecause the proposed business was new, the buyer was new to the business, and no evidence of comparable businesses in the area had been presented, the court concluded that future profits had not been established with reasonable certainty." J. White & R. Summers, Uniform Commercial Code § 10–4 at 322 (1972).

In the cases involving new businesses in which the courts have allowed lost profits, the measure of damages has often been the above-mentioned factor of "comparable businesses in the area," also known as the "yardstick meas-

■ The trial court also could have afforded consideration to Dewey Cates' testimony as to the anticipated occupancy rates of the ten new rooms. "Opinion testimony of the owner of a business and other persons familiar with his operation as to the amount of damages he suffered by way of lost profits" may be used as the basis for an award of consequential damages. *Uganski v. Little Giant Crane & Shovel, Inc.,* 35 Mich.App. 88, 192 N.W.2d 580, 10 UCC Rep. 57, 72 (1971).

■ Defendant has cited *Tonchen v. All-Steel Equipment, Inc.,* 13 Ill.App.3d 454, 300 N.E.2d 616 (1973), for the proposition that an estimate of lost profits made by an interested party is not sufficient evidence to support an award of consequential damages. However, *Tonchen* is distinguishable from the case at bar because there the plaintiff claiming lost profits was attempting to market a new product. In this case plaintiff Dewey Cates' opinion was entitled to some consideration by the district court because of his prior knowledge of and experience in the motel business. "If injury is proven, the amount of [lost profits] is subject to more general proof, especially if defendant's breach makes exact calculations difficult." *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 242 (N.D.Ill.1976), citing *Hannigan v. Sears Roebuck & Co.,* 410 F.2d 285 (7th Cir. 1969).

We thus find that the district court's award of damages in the amount of $4,671.00 is clearly erroneous. *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Fed.R.Civ.P. 52(a). Therefore, the district court's order of October 31, 1975, is reversed and the cause is remanded to the district court to determine the loss of net profits in a manner consistent with this opinion. We recognize that the figure arrived at can only be a fair and reasonable estimate after a broader consideration of all the evidence.

ure." Comment, 56 N.C.L.Rev. 693 (1978). In applying this measure of damages, "the business used as a standard must be as nearly identical to the plaintiffs as possible." *Lehrman v. Gulf Oil,* 500 F.2d 659, 667 (5th Cir.

Reversed and remanded with instructions.

1974). In terms of reasonableness, then, the profits of closely comparable businesses are the second-best measure of consequential damages after a party's own track record.