**Dewey CATES and Barbara Cates, partners doing business as U.S. 40 Motel, Plaintiffs-Appellees, Cross-Appellants,**

v.

**MORGAN PORTABLE BUILDING CORP., a Texas corporation, Defendant-Appellant, Cross-Appellee.**

Nos. 85–1144, 85–1228.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1985.

Decided Dec. 23, 1985.

Rehearing and Rehearing En Banc Denied Jan. 30, 1986.

David M. Harris, Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., for defendant-appellant, cross-appellee.

Terrance L. Farris, Ruppert & Benjamin, Clayton, Mo., for plaintiffs-appellees, cross-appellants.

Before POSNER, FLAUM and EASTER-BROOK, Circuit Judges.

POSNER, Circuit Judge.

This diversity breach of contract suit is not the longest contract lawsuit in history, but it is one of the longest relative to the stakes, which are modest (under $60,000). The case is in its fifteenth year, and this is the third appeal to this court. (May its third coming be the last.) The present lawyers for the opposing parties were debate partners in high school at a time when the lawsuit was already well under way; and 12 years ago the plaintiffs were complaining about delay in the disposition of the case. See "Waiting for Court Date: Justice Eludes Motel Operator," *Metro-East J.*, Aug. 27, 1973. They have since learned patience.

The plaintiffs, Mr. and Mrs. Cates, owned a motel. The defendant, Morgan, a Texas corporation, manufactures portable building units. In June 1970 the Cateses made a contract with Morgan to buy for about $26,000 portable buildings that would add 10 rooms to the motel's 12. The buildings were delivered in September, in defective condition. Morgan promised to repair them, and its men did some desultory work at the site on and off for several months. In April 1971, after the men had not been back for more than a month, the Cateses wrote Morgan to say that they considered Morgan to have broken the contract. Morgan did not reply, and the suit was filed in August. Morgan counterclaimed for the unpaid balance of the purchase price, some $3,000.

Trial (a bench trial) began in February 1973 but was adjourned on the basis of a tentative settlement agreement. Negotiations to make the agreement final were protracted but in September 1973 the parties finally stipulated, in an order signed by the district judge, that Morgan would resume the repairs it had discontinued back in March 1971. The Cateses had done no repair work in the meantime either on their own or by hiring a contractor. The work continued on and off for some months, but not to the Cateses' satisfaction. The parties then agreed to submit all issues of

liability and damages arising out of Morgan's alleged breach of contract, except the issue of consequential damages, to binding arbitration. In October 1974 the arbitrator ruled that there had been a breach and fixed the Cateses' damages (the cost of making the buildings habitable) at some $3,500, against which Morgan was entitled to set off the amount of the contract price that the Cateses hadn't paid. As the setoff was almost equal to the damages, the Cateses ended up with a net award of only $218.05.

The issue of consequential damages, however, was unresolved. Trial therefore resumed in the district court in May 1975. The Cateses claimed some $56,000 in lost profits from not being able to rent the 10 rooms because of the defective condition in which the portable buildings housing the rooms had been delivered. In October the judge ruled that the Cateses were entitled to consequential damages but of less than $5,000. The Cateses appealed. For reasons no longer clear it was not till the end of 1978 that the appeal was presented to a panel of this court, which reversed, 591 F.2d 17 (7th Cir.1979), on the ground that the district judge had set too stringent a standard for proving lost profits. A new trial was held and a judgment for the Cateses rendered in 1982 awarding them the full $56,000 that they had sought. Morgan appealed and again we reversed (this time in an unpublished order, 735 F.2d 1366), on the ground that the district judge had failed to consider Morgan's defense that the Cateses had failed to mitigate their damages.

When the case came back to the district judge the parties agreed to let him decide the issue of mitigation on the basis of the record of the previous trial, but the judge later vacated the stipulation and a new trial was held last year. This time the judge awarded the Cateses $33,532.14 in consequential damages, representing their lost profits for two periods: September 1, 1970, to September 30, 1971, and September 11, 1973, to April 30, 1975. Regarding the intervening period—October 1, 1971, to September 10, 1973—the judge held that the Cateses had failed to mitigate their damages:

> Although the defendant stopped working on March 29, 1971, the Court finds that the plaintiffs had no reason to believe that the defendant was finished with repairing the units. Having no reason to believe that the defendant would not finish, the plaintiffs were under no obligation to mitigate their damages as of March 29, 1971. However, this does not mean that the plaintiffs' duty to mitigate was forever relieved. After a period of time the plaintiffs should have realized that the defendant would not come back to repair the units. The Court feels that after six months, the plaintiffs should have made this realization. Therefore the Court finds that after the passage of six months the plaintiffs' duty to mitigate arose.

The judge also awarded the Cateses $2,500 for what it would have cost them to repair the buildings back in 1971 when their duty to mitigate arose.

The parties have cross-appealed. The main issues concern mitigation of damages, on which see Farnsworth, Contracts §§ 12.-12-.13 (1982). Morgan argues that the duty to mitigate arose before October 1, 1971, and that the judge's finding that the Cateses failed to mitigate damages for a period beginning then (but the precise beginning date doesn't matter) logically precludes any award of consequential damages for a later period. The Cateses argue that the judge improperly placed the burden of proving mitigation on them, that Morgan had an equal opportunity to mitigate and is therefore barred from raising the defense of failure to mitigate damages, and that in fact there never was a period in which they failed to mitigate their damages.

■ The contract was broken in September 1970 when the buildings were delivered in defective condition, and ordinarily the duty to mitigate damages would have arisen at that time and the Cateses would have been required to set about with reasonable dispatch to put the units into renta-

ble shape. But if a seller of defective goods tells the buyer, don't bother to get the goods repaired—I'll do it—the duty to mitigate is suspended; to put this differently, the seller may not insist on mitigation when by its words or deeds it has led the buyer to believe that it has assumed what would otherwise be the buyer's burden of mitigation. See, e.g., *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367, 371 (7th Cir.1978). The district judge found, and its finding is not clearly erroneous, that by promising to repair the defects and sending its men to the motel to do the work Morgan lulled the Cateses into thinking that they didn't have to do anything themselves to repair the defects, because Morgan would take care of it.

But if at some point the seller makes clear to the buyer that it has ceased trying to correct the breach, the suspension of the buyer's duty to mitigate damages ends, and he must arrange for the repairs himself. See, e.g., *Hutson v. Cummins Carolinas, Inc.,* 280 S.C. 552, 560, 314 S.E.2d 19, 24 (Ct.App.1984). This happened sometime after March 29, when Morgan's men disappeared from the site. It is a nice question, however, just when the Cateses should have awakened to the fact that Morgan's men were not coming back. If you invite someone to dinner, and hours after he was due he still hasn't arrived, you had better infer that he isn't coming, and start eating. You can't let yourself and your other guests starve merely because there is a slight chance that he will show up days later.

The Cateses' lawyer wrote Morgan on April 23 that they would not pay the balance of the contract price, because Morgan had broken the contract; and we do not think that by waiting less than a month after Morgan's men stopped work to give their side of the dispute the Cateses waited too long. But when Morgan did not promptly reply with further promises of repair, the Cateses had to assume that the breach was irrevocable, that Morgan's crew was not coming back, and that they had better make their own arrangements for the repairs. How long they could wait after April 23 for some form of reply, how much longer after the expiration of a reasonable waiting period it would have taken them to make the repairs themselves or hire a contractor to make them, and when finally the units could have been made habitable are difficult questions since, in fact, the Cateses did nothing. The judge said six months was all they were entitled to. This was a guess; but in the nature of things no more than a guess was possible; and it was an informed and sensible guess, which we cannot deem clearly erroneous (Morgan conceded at argument that it was not an unreasonably long period)—unless perhaps the Cateses are right that Morgan has the burden of proving failure to mitigate damages, rather than their having to prove mitigation.

Our previous opinion held that the law applicable to the substantive issues in this diversity case is the Uniform Commercial Code as adopted in Illinois (Morgan's portable building units were "goods" within the meaning of the Code, see § 2–105). 591 F.2d at 20. As an original matter there would be some doubt whether under Illinois conflict of laws rules, which of course govern in a diversity suit tried in Illinois, Illinois contract law was applicable to a dispute arising under a contract made in Texas and partially performed there. But the precedents on this question are too uncertain to warrant our reopening the question. See *Boise Cascade Home & Land Corp. v. Utilities, Inc.,* 127 Ill. App.3d 4, 12–13, 82 Ill.Dec. 180, 186–87, 468 N.E.2d 442, 448–49 (1984); *Dr. Franklin Perkins School v. Freeman,* 741 F.2d 1503, 1515 n. 19 (7th Cir.1984); *American Nat'l Bank & Trust Co. v. Weyerhaeuser Co.,* 692 F.2d 455, 460 n. 10 (7th Cir.1982); *Zlotnick v. MacArthur,* 550 F.Supp. 371, 373–74 (N.D.Ill.1982). In any event, the parties to a lawsuit can, within broad limits, stipulate to the law governing their dispute; the parties here have impliedly stipulated to the application of Illinois law; and an implied stipulation is good enough. See, e.g., *Muslin v. Frelinghuysen Livestock Managers, Inc.,* 777 F.2d 1230, 1231

n. 1 (7th Cir.1985); *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 530–31 (7th Cir.1985).

■ The Uniform Commercial Code requires mitigation of damages, see UCC § 1–106, comment 1, but it does not say who has the burden of proof on the issue of mitigation. There are no Illinois cases on the point, and cases from other jurisdictions are hopelessly divided—compare for example *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 550 (6th Cir.1981), with *Wilson v. Hays*, 544 S.W.2d 833, 836 (Tex. Civ.App.1976). The debate would not be an easy one to resolve on grounds of policy. On the one hand the plaintiff has easier access to information about his own efforts to mitigate damages. On the other hand he is more likely to mitigate his damages than to trust entirely to his legal remedies for breach of contract, and on this ground similar disputes over burden of proof in tort cases have been resolved in favor of placing the burden of proof on the defendant—for example to show that the plaintiff was contributorily negligent or failed to take steps to avoid some or all of the harmful consequences of the defendant's tort. See Prosser and Keeton on the Law of Torts 451, 458 (5th ed. 1984). But we can sidestep the debate by observing that the cases make no distinction between the burden of proving mitigation of damages under the Uniform Commercial Code and under the common law of contracts, and by asking where Illinois assigns the burden of proof regarding mitigation of damages in common law contract cases. The answer is clear: on the defendant. See *Fisher v. Fidelity & Deposit Co.*, 125 Ill.App.3d 632, 642, 80 Ill.Dec. 880, 888, 466 N.E.2d 332, 340 (1984); *Dillman & Associates, Inc. v. Capitol Leasing Co.*, 110 Ill.App.3d 335, 343–44, 66 Ill.Dec. 39, 46, 442 N.E.2d 311, 318 (1982). In default of better information we must assume that in a case under the Uniform Commercial Code, too, Illinois courts would place the burden of proof on the defendant. It was therefore Morgan's burden to prove that the Cateses had failed to mitigate their damages.

■ Burden of proof is important when the evidence is in equipoise, or when no evidence is put in on an issue, or the case is tried to a jury, which may attach great significance to who has the burden of proof, not fully realizing (or accepting) that burden of proof should determine the outcome only when decision is balanced on the razor's edge. Although the district judge had ruled that the plaintiffs had the burden of proof, his opinion does not mention burden of proof and nothing in the opinion suggests that it played a role in his determination that after six months the Cateses had a duty to mitigate damages. Both parties put in evidence and the judge picked a period, not unfavorable to the Cateses, by the end of which they should have mitigated their damages. The judge's error about who had the burden of proof was harmless. See *E.S.I. Meats, Inc. v. Gulf Florida Terminal Co.*, 639 F.2d 1348, 1352–53 (5th Cir.1981).

■ We turn now to the Cateses' argument that they had no duty to mitigate damages because Morgan had an equal opportunity to mitigate. At first blush the concept of equal opportunity to mitigate seems to assert the true but irrelevant proposition that a defendant can always avoid liability by not breaking his contract, and in that sense always has an equal opportunity with the plaintiff to mitigate the latter's damages. See *Rossi v. Mobil Oil Corp.*, 710 F.2d 821, 834 (Temp.Emerg. Ct.App.1983). But there is a little more to the concept than that. In the first case to employ it, *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 530 (3d Cir.1978) (alternative holding), the defendant had broken its contract to supply concrete for the plaintiff's building project, and it defended on the ground that the plaintiff should have turned to another firm, Trap Rock, as a substitute source or at least a supplemental source of concrete. The defendant itself, however, had used Trap Rock in the past, and could just as easily as the plaintiff have turned to it to make up the deficiency in its own supply. See also *Midwest Industrial Painting of Florida,*

*Inc. v. United States,* 4 Cl.Ct. 124, 133 (1983).

We need not try to guess whether Illinois would recognize the "equal opportunity" doctrine (if so recent and rarely applied and, as we are about to see, questionable a legal idea can be called a doctrine) in a suitable case. The doctrine is discordant with common law principles, which demand a reason for not letting losses lie where they fall. If a plaintiff can avoid a loss at a cost no greater than the defendant would bear, one might have thought that he would have to incur the cost (for which of course he could seek reimbursement from the defendant) and thereby avoid the loss. Be that as it may, the parties' positions were not symmetrical here. Morgan's business is making portable housing units, not running a motel. While it might well have been able to perform the necessary physical repairs of its defective units as well as the Cateses or some contractor hired by them could do—might even have been able to hire a contractor as easily as the Cateses could have done, though being an out-of-state company it might have been at a disadvantage in this respect—no argument is made that it could have done these things at lower cost than the Cateses; and it could not have made other adjustments that might have avoided all or some of the consequences of its breach at a lower cost than making physical repairs would have entailed. The Cateses should have (but Morgan could not have) considered carefully the possibility of reducing their lost profits either by ordering substitute units or by making superficial repairs to the defective units and then renting them at cut rates. Contract law seeks to preserve the buyer's incentive to consider a wide range of possible methods of mitigation of damages, by imposing a duty to mitigate even if some of the possibilities are equally within the seller's power. This incentive would be lost if Morgan's ability to repair its defective units—only one method, and maybe not the cheapest method, of reducing the Cateses' consequential damages—excused the Cateses from all duty of mitigation.

We thus agree with the district judge that the Cateses had a duty to mitigate damages and that it arose on October 1, 1971. Morgan argues that, if so, consequential damages cannot be awarded for any subsequent period, for if the Cateses had mitigated their damages back in 1971 as they were supposed to do they would have had no subsequent consequential damages. They would have been renting out the units and earning rental income since 1971, rather than only since 1975 when they finally made the repairs that made the units habitable.

This argument is inconsistent with fundamental common law principles. Supposing it to be the fact, as found by the district judge, that between September 1973 and April 1975 "the defendant intermittently worked on the units and made assurance that the units would be repaired," are the Cateses to be forever at the mercy of Morgan's misrepresentations and broken promises because they failed to mitigate damages back in 1971? We think not. Suppose that having failed to mitigate their damages by repairing the units in 1971 or 1972 the Cateses finally went and signed a contract with another contractor in 1973 to make the repairs, and the contractor then broke his promise. The Cateses would not be barred from recovering contract damages from him merely because if they had repaired the units back when they were supposed to they would never have had to sign this contract. To rule otherwise would be to say that if a person breaks his leg through his own carelessness, he cannot complain if the doctor sets the leg negligently and as a result makes the break worse. The Cateses in our hypothetical case would not, merely by failing to mitigate damages, have made it more likely that they would be victimized by a subsequent contractor when belatedly they began to mitigate, and therefore they would not be in law the cause of that subsequent harm.

The analogous case in tort law is *Berry v. Sugar Notch Borough,* 191 Pa. 345, 43 A. 240 (1899). The plaintiff, the motorman of a trolley, sued the town for negligence

in letting a rotten tree fall on the trolley, injuring him. The defense was that he was contributorily negligent, because he had been speeding, and if he had been driving more slowly he would not have been under the tree when it fell. The defense failed. The motorman's negligence did not make the kind of accident that occurred more likely to occur. No more did the Cateses' initial dawdling about repairing the defective units make it more likely that a contractor would break his promise to repair the units. It makes no difference who the contractor was. Morgan made a fresh promise to repair, which it broke, and by breaking became liable for the consequential damages of the breach.

■ It might have been more elegant if the Cateses had in 1975 moved to amend their complaint to add as a new and separate cause of action the breach by Morgan of the stipulation that the parties made in September 1973, or for that matter if the Cateses had filed a separate breach of contract suit which would have been consolidated with the original one. There would have been no jurisdictional obstacle to a new suit, since the parties are of diverse citizenship and the amount in controversy exceeds $10,000 even when limited to the second period for which the judge allowed an award of consequential damages. Since a complaint can be amended at any time, even in the court of appeals, to conform to the evidence, see, e.g., *Reese v. Elkhart Welding & Boiler Works, Inc.*, 447 F.2d 517, 528–29 (7th Cir.1971); *Fifth Ave. Bank v. Hammond Realty Co.*, 130 F.2d 993, 995 (7th Cir.1942); *Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650, 654 n. 2 (9th Cir.1981); 6 Wright & Miller, Federal Practice and Procedure § 1494, at pp. 476–77 (1971); cf. Fed.R.Civ.P. 15(b), we could simply deem the complaint so amended. But such formalities are unnecessary. The district judge was entitled to find that Morgan had made and broken a fresh promise to repair the units, leading the Cateses to forbear and thereby imposing on them consequential damages for the period from September 1973 to April 1975, when Morgan's second breach became irrevocable

and the Cateses finally completed the repair of the units.

■ The Cateses' other damages, to which we turn now, are repair costs. The Cateses argue that $2,500 is too low because it is the cost of repair in 1975, and it would have been higher in 1971 if they had mitigated damages then, since they would not have had the benefit of the work, such as it was, that Morgan performed pursuant to the stipulation of September 1973. Morgan says it is too high, because the Cateses' income tax return reported only $1,300 as the cost of those 1975 repairs. We would have thought the issue settled by the arbitrator's finding that it would have cost the Cateses some $3,500 to repair the units back in 1971. The Cateses shy away from so arguing because they want us to award them $15,000 based on bids they solicited in 1971 (to which Morgan replies with great force that the bids were on work that would have greatly improved and not merely repaired the units), and Morgan because it wants to reduce the amount to $1,300. But since the parties agreed to submit the issue of repair costs to binding arbitration and the judge confirmed the arbitration in a portion of an earlier judgment which has never been challenged, it fixes the repair costs for this lawsuit. The Cateses are entitled to their consequential damages as admeasured by the district judge, plus $218.05 (the net due them under the arbitration award), or a total of $33,750.19.

■ The last two issues are procedural. Morgan argues that the judge had no power to set aside the stipulation in the final pretrial order that the latest remand be tried on the record of the previous trial. Although stipulations are to be encouraged in order to economize on the costs of litigation, a judge has the power to relieve a party from a stipulation when it is reasonable to do so, and it was here. It turned out that the record of the previous trial did not fully illuminate the issue of mitigation of damages, which became a focus of concern in the case only after we reversed the second judgment; the judge was therefore

acting well within his broad discretion in the management of the litigation process to order a further, and brief, evidentiary hearing "to prevent manifest injustice." Fed.R. Civ.P. 16(e); see, e.g., *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 333 (5th Cir.1981); *Seneca Nursing Home v. Secretary of Social & Rehabilitation Services*, 604 F.2d 1309, 1313–14 (10th Cir.1979).

Finally, Morgan argues that the judge violated Rule 408 of the Federal Rules of Evidence by using the stipulation of September 1973 to fix liability for consequential damages incurred thereafter. The rule provides that statements made in settlement negotiations are not admissible to establish a party's liability, or damages, in the dispute that was the subject of the negotiation. Nothing Morgan said or agreed to in the negotiations that culminated in the execution of the stipulation in September 1973 could have been used to establish its liability for the breach of contract that occurred in September 1970 or to fix its damages for that breach. But no act or statement of Morgan's connected with these negotiations was used to establish its liability for breach of contract, which by this time Morgan concedes. It may seem that the negotiations and specifically the stipulation itself are being used to prove an item of the Cateses' damages, namely the consequential damages from September 1973 to April 1975. But this is true only in the literal sense that, as the case has been presented, those damages are deemed damages of the original breach. As Morgan itself is at pains to argue in connection with the Cateses' failure to mitigate damages, any damage liability stemming from the original breach ended on October 1, 1971, when their duty to mitigate accrued. Morgan's liability for additional damages beginning in September 1973 is based on its breaking a later promise, the promise made in the stipulation to resume repairs. Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement. See, e.g., *Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir.1982). That is the Cateses' argument with regard to the later period of consequential damages.

We affirm the district judge's judgment except to change the amount of damages to $33,750.19. No costs shall be awarded in this court.

MODIFIED AND AFFIRMED.